Mr. Martinez you may proceed. Good morning, your honors, and may it please the court. The jury in this case ordered Puma to pay a record-setting 22 million dollars in damages for defamation. It did so even though there was no actual real-world harm to Mr. Eshelman and even though the statements at issue were not defamatory per se as a matter of law. This outlier verdict should be set aside for three reasons which I'll try to quickly summarize up front. First, there was no personal jurisdiction over Puma. The district court based jurisdiction on a letter that Puma sent all its shareholders around the world, including a few in North Carolina, but that letter didn't contain the alleged defamation. It merely printed a link to Puma's investor web page where a separate link  The non-defamatory letter which predated and which three clicks removed from the later created slides didn't form the basis of Eshelman's claim and couldn't give rise to jurisdiction. Second, the statements at issue weren't defamatory per se. Puma didn't accuse Eshelman of personally committing the fraud. It said he was involved in the fraud in a more general sense. Eshelman himself conceded that involvement in his testimony to Congress where he accepted responsibility for his failures of omission and oversight with respect to the fraud. And finally, your honors, the outlier damages award was grossly excessive here. Eshelman offered no proof of any real-life harm. The final award was twice the size of his own self-serving estimate of damages and it was more than ten times the size of the next largest defamation award in state history. North pluck arbitrary numbers out of thin air. The damages award should be remitted or sent back for a new trial. Your honor, can I ask you a factual question? What is your best estimate of the number of people who viewed the presentation? Your honor, I think the the record shows that in the year and a half after the presentation was posted, a grand total of 198 people downloaded the presentation and that's No, no, no, I'm talking about the total amount. The presentation was available on PUMA's website, that's true, and there were a hundred and ninety-eight times it was done. But we don't know how many people viewed it on the web site of the SEC and PUMA stipulated the presentation could be viewed online. So I'd like you to consider all of those and tell me what your best estimate is. Your honor, I don't think I don't have a basis for estimating how many people viewed it from the SEC website. I do think that it's notable that it was viewed less than 200 times from PUMA's website. It's not at all notable if it was viewed two million times from the SEC's website. And I understand that you don't have any ability, but you have more ability because you are involved in this case and presumably an expert on SEC. So if you don't want to venture anything, that's fine. You don't argue that it wasn't available on the SEC website or online. Is that correct? It was available on the SEC website, Judge Motsch, but let me just say a word on that. I can't estimate a number, but I do think that if it was it was viewed by a lot of people, I think we would have seen some evidence of actual harm to Mr. Eshelman. If people actually interpreted it in the way that he suggested it should be, it had to be interpreted. And if he suggests, you know, he suggests this was such a terrible thing that was said about him, we would have seen some evidence somewhere. They probably would have put forth at least one person who read it and believed it. In fact, they only put forward two pieces, they identified two individuals only who had read it, and both of them said, that's Mr. Gross and Mr. Lee, both of them said they didn't believe the PowerPoint presentation. And so I think in a circumstance in which... I'm just not even, I think this is a sidelight, so we shouldn't spend any more time on it, but a lot of us read the New York Times, indeed follow the New York Times or the Washington Post, if you heard our believe everything that is said or disbelieve it, but we hear it, we see it, so I just don't. That's fair enough, Your Honor, and I'll turn to personal jurisdiction, but last comment, I think I'll just make one. Well, why don't you turn to damages? I think maybe that might be the strongest argument. I'd be very happy to turn to damages, Your Honor, and I think that your questions really kind of speak to that point. I think that in a circumstance, you know, here we have a situation where the damages that were awarded were based on a presumed damages theory, and the reason they could pursue that theory is because they brought a defamation per se claim. As you know, we don't think that the statements were defamatory per se, but let's just assume we are in presumed damages world, and the test under North Carolina law is that presumed damages are available in defamation per se cases, but even in those cases, they need to be estimated to a reasonable certainty under the circumstances, and they have to be an estimate, however rough, of the North Carolina standard pattern instructions and how the jury was instructed here, and here I really think there's no connection, no rational connection, between the massive damages award in this case and the actual harm that Mr. Eshelman suffered, and I think there are three basic points to make. First of all, the concepts of specific damages and general damages, different kinds of compensatory damages. I think those are different types, but I think that we're not contesting the idea that general presumed damages were available. What we're saying, though, is that even in the cases when they are available, even in circumstances like defamation per se cases, where the law recognizes that it's going to be harder than usual for a jury to put a precise number on the damages award, the jury's amount still needs to be reasonable, and we know that from cases like the High Gallons case and also the Fontenot case. The Fontenot case was a companionship case, but involved a similar problem where the loss of companionship damages are hard to estimate, and the law recognizes that, but courts nonetheless, and this court nonetheless, held that under North Carolina law, you can't just pluck a number out of thin air. It needs to be a reasonable estimate, and here we think there are three major problems with the jury's ultimate conclusion as to the presumed damages. The first one is the fact that there really is no good reason to believe there was actual harm. We think, and we talked a little bit about how many people may have read the statement, we don't think there's any real reason to think that a large number of people read the statement, whether you go by the 198 number that's in the record, or even if you think about how many folks may have read it on the SEC. I mean, these statements... That is in the record, too. We just don't know the number, and you're not willing to give us any approximation. So it might be limitless. It could be limitless, but as I said, I think the reason... Well, that's a problem for you, isn't it? I don't think so, Your Honor, because I think if it really had been viewed by a lot of people, we would know that by one of two things. Either they would have introduced evidence of someone who'd read the statements, or they would have introduced evidence of some actual harm that befell Mr. Eshelman, and here we know that Mr. Eshelman's reputation remained intact. The voluminous evidence that was presented at trial showed that even after the defamation happened, he continued to serve on seven boards of directors. He received an honorary degree from the University of North Carolina. He received the CEO of the Year Award. He received the Star News Lifetime Achievement Award, and he was inducted into the North Carolina Business Hall of Fame. These are not the hallmarks of someone who's been somehow... His reputation has been torn to shreds by a defamatory statement that appeared on page 12 of a PowerPoint presentation that was buried on a couple of websites, and so there's really no reason to think that in a circumstance in which Mr. Eshelman received so many awards, in which his reputation was reaffirmed so many times even after the defamation, there's no reason to think that there was any real harm here, and certainly not harm to the level of $16 million. I think the second... Pucuma was represented at trial, isn't that correct? I'm sorry, Your Honor, I couldn't catch that. Pucuma had representation at trial. We were represented by counsel at trial, yes. So these arguments could have been made to the jury, right? Yes, Your Honor. And presumably were made to the jury. That's right, Your Honor. They were made to the jury, but I think what North Carolina law recognizes, and what federal law recognizes, is that trial courts and appellate courts don't just sit and rubber-stamp jury awards, and in a circumstance in which a jury picks a number out of the air that's arbitrary and violates the instructions it was given, which is to make a reasonable approximation of the probable extent of actual harm, and it picks a number out of the air that's not justified, that's precisely why we have appellate review of these kinds of awards. And I think that's the kind of analysis that this court engaged in in the Mygallon's case, where it held that a $4 million defamation award was too much, and you know, that that had to be sent back. I think the other indicator, a second indicator though, of the idea that the damages award in this case was wildly excessive, is look at what Mr. Eshelman himself said four times before trial. So under the federal rules of civil procedure, he had to tell us what amount of damages he thought he had suffered, and four times, over and over again, he pegged the extent of the actual harm he suffered at $7.5 million. He said that over and over again, and obviously he was incentivized to wildly over-inflate that number in the way that... I thought he made different estimates, excuse me, I thought he made different estimates of the amount of damages he suffered. Right, so before trial, in the Rule 26 disclosures, four times, he said it was $7.5 million, which is less than half of what the jury awarded. Now later, in his deposition, he said it was $100 million. At trial, he said it was incalculable, and then in the closing statement, his counsel said that the number was $52 million. And so I think if you look at the sort of blizzard of arbitrary numbers that are being thrown out there, I think what they show is that what's really going on here is pure conjecture. Eshelman was picking numbers out of the air, and throwing them around, and hoping that something would stick, and he was able to persuade the jury to give him a big number. So what is the remedy then? I think the remedy in this case, Your Honor, would be a remediator or a new trial on damages. I think a remediator is probably the cleanest way to bring this case to a resolution. We've said in our briefs that, you know, this is the biggest presumed damages award, biggest compensatory award for defamation in North Carolina state history. If you wanted to remit the award just so that it was tied for first instead of first, I think you could bring the compensatory award down to $1.5 million. We think that's still too much, but, you know, we would be willing to live with that. We could all put this case behind us and move on to our various other endeavors. I think if you weren't comfortable with picking a specific number, we think the best approach would be just to remand for a new trial on damages. Either of those two remedies would be appropriate, Your Honor. Is that really plausible? Because liabilities seem to be pretty heavily attached to damages, so a trial just on damages seems a little difficult. I think you could have a new trial on damages. I do think the jury would have to consider some of the same evidence, you know, that was presented before, but I think the question that the jury would be facing would be one that it would be appropriate to ask it to resolve again, which is, you know, given everything we know about what was said here, what's a reasonable estimate of the harm to Mr. Eshelman? But again, I think that the remediator option is a perfectly good option. Well, it is the option that we have usually taken and that we set what the remediatory is. We set it for a new trial or take this remediatory, and your highest bid here is 1.5 million dollars. Is that right? Even though the gentleman got 23 million dollars. Well, Your Honor, that doesn't sound like remediatory country. Well, so he got 16 million or so, just under 16 million on the compensatory. So we've proposed 1.5 on the compensatory and a proportional reduction of the punitives. And the reason we think that's reasonable is because that would put Mr. Eshelman's award here at being that he would have the largest defamation recovery in North Carolina history. And I think if you look at the cases that are the next two largest, which are the only other two defamation awards in North Carolina history we've been able to identify, they're 1.5 million and 1 million. If you look at the facts of those cases versus here, we think there's a world of difference. And in fact, those plaintiffs are much more, were much more deserving of a recovery of that size than Mr. Eshelman. In both of those cases, their livelihoods were, they were law enforcement professionals whose livelihoods were destroyed by widely publicized defamation essentially alleging that these folks were either perjuring themselves or were making up evidence against criminal defendants. So that was a livelihood destroyed. No one was putting those people in the law enforcement Hall of Fame after that defamation was committed. And so we think we're trying to, we're trying to be reasonable. We're not stuck to a 1.5 number. We think frankly it should be lower, but we're willing to accept that because we think that that would give Mr. Eshelman the biggest recovery in North Carolina history. We think that would be a fair and equitable way to just resolve the case so we can all move on. Our company, my client's company is trying to develop cancer drugs. We've got other things to try to focus on. And we're trying to sort of meet a, find a reasonable to go beyond that because both, you know, because there's no evidence of any actual harm, because the comparative cases that Mr. Eshelman relies on and that the district court relied on here really have nothing to do with the fact that this case, I mean, you know, the Cantu case was a case, your honors, where there was a large award for defamation, but the defendant in that case had accused the plaintiff in a widely circulated magazine that was of bribing the president of Mexico, of conspiring with Saddam Hussein. The plaintiff had lost multiple contracts for hundreds of millions of dollars and he was being investigated by the U.S. and Mexican authorities. And that case has nothing to do with this one. And yet that's the case that Mr. Eshelman and the district court cited to justify this outlier award in this case. And the two other cases aren't even, are not on point either. So I think for all of those reasons, we think that the compensatory award here is, you know, wildly overstated, has no basis in the evidence or in common sense. And I think there is a middle ground here. If you think, if you conclude, we would disagree with this, but if you conclude that the defamation verdict stands and if there was, that there was personal jurisdiction, we think a reasonable middle ground here is to give Mr. Eshelman a recovery that's equivalent to the biggest in North Carolina history. We'll end the case there and we can all, we can all move forward. Your Honor, if I could just say one quick word on the defamatory per se question. I do think, Your Honor, that the statements here were not defamatory per se. We do need to win on either statement. If we win as to either statement, that would be enough for a new trial. If we win on both statements, that would be enough for judgment. The defamatory per se standard in North Carolina law is extremely high. It's very difficult to satisfy and that's what differentiates defamatory per se claims from defamatory per quote claims. Here, the statements that Mr. Eshelman was involved in fraud was not defamatory per se because unlike what the district court said, no one was personal, accusing Mr. Eshelman of personally committing fraud. They were accusing him. What does involved in fraud mean? How is that not defamatory? It's not defamatory, Your Honor. First of all, it's a, involved is a broad word, um, and it doesn't mean that Mr. Eshelman was involved in the fraud in the sense that he was in charge of the company, PPD, when the fraud happened during the trial and he didn't report it to the FDA. And if you look at the slide could have said that and I understand the slide, you know, there was a link to his statement, but the slide didn't say, uh, he was involved to the extent he didn't report it to the PPA. Uh, Your Honor, I think the slide, the slide laid out, the slide didn't accuse him of personally committing the fraud. And I think the link's to the PowerPoint testimony. If you look at the PowerPoint testimony at page 1598 of the joint appendix, you have, so at the, I believe it's at the top of the page there, Mr. Eshelman is being confronted by Congressman Stupak, who clearly isn't. You said that, you said that, that this did not, you all didn't per, accuse him of personally being involved in the fraud, but it says PUMA's board does not believe that someone, wonder who that someone is, who was involved in clinical trial fraud, uh, should be on the board of directors. That's right, Your Honor. That is accusing him of, if he's the someone of being involved in fraud. We accused him of being involved in the fraud, but we think that's different from personally committing the fraud and the way in which he was involved. It is, but that's not what, but that's. But what we said involved. So if someone could read this to believe that he personally committed the fraud, you agree that would be defamatory because you don't, that's not what you're saying. I think that that could be right, Your Honor, but I think, but just to be very clear, the North Carolina standard is that if there is a plausible reading of the statement that is not defamatory per se, then that's enough for us to believe. And what's the plausible reading of the statement that's not defamatory? And the statement being, just the statement, does not believe that someone who was involved in clinical trial fraud, blah, blah, blah. Right. Are the plausible reading is that, that he was involved in the fraud in this, in the sense that he was responsible for the company and he did not report the fraud to the FDA. And I think just a final point on this, Your Honor, on 1598, he accepts responsibility. I don't think Mr. Eshelman would have accepted responsibility for his failure to bring the fraud to light if he had been totally uninvolved. And I think that's enough to show that what we understood,  in the exact same sense that Mr. Eshelman accepted responsibility for the fraud. But Your Honor, I see I'm out of time. I'll just say, if you disagree with us on this, I would go back to the damages argument, Judge Motz. It is the part of the case that strikes me as the most, you know, the most, the biggest problem in the case. And I do think that there is a straightforward way, even if you think that, that liability, the liability judgment was sound, I do think the, the fraud, the defamation damages should be knocked down very substantially. Thank you very much, Your Honors. Thank you so much, Mr. Martinez. Ms. Locke? Thank you, Your Honor. May it please the Court, my name is Libby Locke, and I represent the appellee and cross appellate, Dr. Frederick Eshelman. Puma's appeal follows a five-day trial in which an 11-member jury, after deliberating over two days, unanimously found that Puma falsely accused Dr. Eshelman of defamation, which he found it after being involved in clinical trial fraud. Judge Dever, as a district court judge, was entirely correct in rejecting Puma's damages argument that it makes and remakes here today, and recognizing that based on the circumstances of this case, there was compelling, Judge Dever's words, and overwhelming evidence that the jury heard that supported both the verdict and the damages award. Citing also the extensive... Locke, let's deal with that overwhelming evidence of the damages. Now, I'll talk about the per se later, but let's talk about the damages. In that sense, it was presumed damages. That was the posture it was in. But what about the quantum of the damages? What was the evidence as to the quantum? And I'm going to flip the question, the very good question Judge Motz asked about how many people saw it on the SEC. Well, if that was available, was that introduced by your side to say this, how many people saw it? What was the evidence of the quantum of the damages? Yes. Yes, Your Honor. To the point of how many people saw this, we did present evidence that this defamation went around the world. It was seen by individuals not only throughout the United States, but also throughout the world. And I'd point, Your Honor, to the... Ninety-four people seeing it in separate companies would be around, the country would be around the world. And this was also sent to industry analysts at Bank of America and Vanguard in the very industry pharmaceutical sector that would cause Dr. Eshelman the most harm. But I think it's very important... Can I follow that up? Tell me what this evidence was. In other words, we had an estimate of this 198 on the website, and then we have it on the SEC website. And then we have, it was online, Puma said. So what fills that in is, I think, what Judge Gregory and I are trying to find out. What evidence is telling us how many people looked, if there is evidence, how many people looked at the SEC website or Puma's website? We don't know. We know that there were hundreds that saw it on Puma's website in the two different places. I think the number was 450. We don't have a number from the SEC. But the facts in this case were stipulated to you that it is permanently available online. And the North Carolina pattern instructions clearly say that you don't just look at the current harm, but also the future harm, the future harm. And those are words from the pattern instructions. The stipulations, this is a permanent publication that cannot be removed, even if this court could order it. And obviously, it can't because this is a First Amendment case and an injunction is not appropriate. But we could not have it taken down from the SEC's website, even if we had wanted to. But let me point out, there are 10 factors that the North Carolina pattern instructions cite that the jury should consider in a presumed damages award. Counsel, before you go, counsel, before you go to 10 factors, can we just go back to Judge Gregory's question for a moment? And in answering it, I thought you were saying we know that people in foreign countries, so how do we know that? That's what I was trying to get at. There is evidence in the record, there is. And this is, there's evidence of the record of, from Google Analytics, of how many people went to Puma's website and viewed it and where those IP addresses are. I don't have the site for that, for Google Analytics from Puma's website. We do not have that from the SEC, but it is a permanent form and cannot be removed. To the point, opposing counsel says that there was no real world harm here. And I want to just point out, the standard of review, given the fact that Puma did not move under Rule 50, Mr. Martinez completely avoids the standard of review that applies here after failing to move under Rule 50. When there's the Bristol Steel case and the Minter case is very clear that where there's not a Rule 50 motion, and there is an attempt to bring a Rule 59 motion for a new trial, the court's review is exceedingly limited and is only for a complete absence of evidence, a complete absence of evidence to support the verdict. Now, here, to go to the 10 categories, and I won't go through all of them, but let me just say the 10 categories, you know, this is the most damaging allegation, an allegation of clinical trial fraud against the founder and CEO of a $2 billion a year company whose primary mission is to ensure the integrity of clinical trials. And it wasn't just made against anyone. It was made against Dr. Eshelman, who is one of the most prominent and extraordinary leaders in the United States pharmaceutical industry. He has contributed so much to the pharmaceutical industry that the UNC Pharmacy School, the number one pharmacy school in the United States, thought that thought his contributions to the industry and to UNC were so significant that it named the pharmacy school, the number one pharmacy school in the United States after Dr. Eshelman. And opposing counsel's point was that none of this seemed to have hurt his reputation. He went through a whole list of, you know, Hall of Fame, this and that. What's your response to that argument? Yes, Your Honor. So the 10 categories, PUMA attempts to focus only on Category 5, which is the, the Category 5 is the proof of actual harm, the proof of actual harm. The PUMA asked this court to ignore Categories 1 through 4, and also Categories 6 through 10 and focus exclusively on Category 5. So basically, you don't, you don't, you don't, you concede almost Category 6, but you say that you, you know, the other nine factors weigh heavily in your favor. No, Your Honor, we do not concede and as Judge Dever recognized in his denial of the Rule 59 motion and also in his summary judgment decision, that Dr. Eshelman did in fact allege and there is evidence in the record and proof of actual harm here. And that is the loss of retirement years. He testified. Is that right? We're relying on his testimony and his friend's testimony. Dr. Eshelman testified about the, about the, the loss of reputation. I'm sorry, excuse me. The actual effect on the publication. There's unrebutted evidence that Dr. Eshelman testified to that he lost years of retirement. For a man who counsels, is there any evidence besides his testimony and his friend's testimony as to the harm caused? This is, there is certainly evidence that the presentation was sent to Bank of America analysts. Right, I understand that. But we're talking about in contradistinction to all these awards and the man of the year and his extraordinary, the University of New York. Do you have that you have 40 people saying, this was withdrawn? So, he certainly lost years of retirement. That's what he testified to. That's what I say, to his testimony and his friend's testimony. Is there anything else? The friend's testimony, it was, it was industry and it was, excuse me, I was a shareholder of PUMA, who testified that if, you know, if someone was involved in fraud, it would have lowered his estimation in the community. And in fact, Dr. Eshelman did lose the proxy contest here. We shouldn't lose sight of the fact that Dr. Eshelman did, in fact, lose the proxy contest here. And if I could, if I could come back to the retirement point, Dr. Eshelman testified that he, he felt he had to continue working because if he had retired, he's on the board of directors of publicly traded multinational companies. If he had retired in the wake of these allegations of him being involved in criminal, criminal, clinical trial fraud, and filed with the SEC, if he had been, if he had been, it would have confirmed the belief that this was true, that he did, in fact, he had to work longer so that the industry and that those of Dr. Eshelman's peers, and those who didn't know him, that he wasn't slinking off and retiring after this damaging allegation was made. And as a man in his 70s, you can go on and argue with everyone, but I think we should reserve the substantial amount of time for them. Thank you. Let me just finish on this point on damages. For a man who's in his 70s, who has the financial resources that Dr. Eshelman does, his time is his most valuable asset. His time lost with his family, with his children, and with his grandchildren, when he was required to work for, at the point of trial, it that point, now it's been five, to, to, to undo the harm that this caused. Let me, let me turn to, Would you turn to this, and this, this is the question I have about this, per se. This was said that he was involved in a clinical trial where fraud was, clinical trial fraud, fraud, right? So, that, it was in the context where he's saying that whether our company should be, have this person on the board, who was, whose company was involved in these clinical trial things, correct? I mean, in that, the broader sense of it, you asked about interpretation. One interpretation is that PPD was, had a responsibility in that clinical trial. Within that clinical trial, there was fraud. So, it could have been a meeting that, in the larger sense, involved me. He was involved because he was the head of that company at the time that they had the responsibility for a clinical trial. Is that a fair interpretation of the doctrine? No, Your Honor, and I want to make one fact, I want to pause and make one fact perfectly clear. Dr. Eshelman and the company he founded, PPD, were the victims of this clinical trial fraud. PPD uncovered, blew the whistle on, and reported this clinical trial, reported this fraud, committed by a third party doctor who was not a PPD employee, reported it to the drug sponsor, Aventis, and also, which Mr. Martinez does not disclose to this court, reported it to the IRB. The IRB is an entity created by FDA regulation that is duty-bound to report reports to it, to the FDA. And the jury heard all of this evidence. And if you look, going back to the per se question, if you look at the context in which these statements were made, the presentation talks, the title itself talks about how Eshelman continues to demonstrate a lack of integrity, and his misrepresentations are no surprise given his history. And Mr. Martinez, in his brief, talks about, well, he gives this example about the Astros and talking about the general manager of the Astros, who wasn't actually involved in the cheating scandal. But the more apt analogy is saying that the Atlanta Braves or the Washington Nationals, who were the victims of the cheating scandal, were involved in the cheating scandal itself. And what is remarkable here is that opposing counsel is trying to relitigate the issue of falsity through the guise of this per se ruling. And it's just not appropriate, given the failure to move under Rule 50, which is completely ignored in the argument here in the standard of review. I'll just ask real quick, then you can move on to damages. Mr. Martinez said that your client, that Mr. Eshelman took responsibility. Is that correct? Is that right? So when he was, he did not. So when the entire, I think Mr. Martinez is taking that clip entirely out of context. It's a clip that was shown. What responsibility was taken, if it were? I'm just asking, did he? So when he was pressed at the hearing, he says, I'm the CEO, the buck stops with me. It was a much more general statement than saying, yes, I knew there was fraud and I accept responsibility. I didn't report fraud. In fact, the congressional testimony was very clear that PPD did in fact report these misrepresentations to the, these issues to the IRB. So I think the clip is taken entirely out of context. The jury heard it, watched it, considered it, and rejected it. In terms of saying that the statements at issue in this PowerPoint presentation, the jury concluded that they were false, overwhelmingly. And based on the damages award, thought they were false in a significant way. Let me turn briefly to attorney's fees, Your Honor. Attorney's fees are mandatory. You're not going to argue damages, you're making a mistake. So I don't think that the award should be remitted at all, Your Honor. Particularly given the standard of review here, that there has to be a complete absence of evidence in order to, to remit or to grant a new trial. To go to the point- No, no, no, no. Not for the remitted award. That's not the case. It's not a complete absence of any damages, a complete absence of the damages award that we've given. Correct. And a complete absence- So your position is no remittance award. I'm not going to argue about that, that we were entitled to the entire damages award. Is that your position? Because again, it doesn't, we have nothing to say with, we have nothing on the other side of his remittance argument. But if that's what you want to say, fine. I don't think that a remittance would be appropriate here. Judge Dever considered under, under Rule 59, considered the factors that the North Carolina pattern instructions say are appropriate for this kind of award. The only argument here is that there is no evidence of actual proof of harm. I respectfully submit that given the years of retirement that were lost, particularly we find the plaintiff as he comes, someone with substantial means, the value of that lost, those lost retirement years to someone of Dr. Eshelman's stature and means, this is not, I would argue it's I thought I heard opposing counsel say that several times prior to trial when asked about damages, Mr. Eshelman's response was 7.5 million. That was the initial estimate in the complaint. Of course, it was amended once discovery concluded, and I'm not concluded, but as discovery was ongoing, it was amended in the initial disclosures itself. And Dr. Eshelman testified. And there was a basis. Mr. Martinez talks about the Fortnacht case and how the number can't be arbitrary. The Fortnacht case really just stands for the proposition that it can't be an arbitrary multiplier. There, the lawyer actually said to the jury, you should just pick an arbitrary multiplier, which is certainly not what happened here. In fact, the record evidence is Mr. Auerbach, and what we argued to the jury is that Mr. Auerbach had received compensation in a three-year period that was valued at $52 million that is in the stipulation. And in this case, there had been a three-year period where the defamation had stood. Mr. Auerbach had testified based on the strength of his own reputation. He was able to monetize his own reputation to the tune of $52 million. That was the basis. It was the symmetry and the basis for the argument as to why we asked for $52 million. Dr. Eshelman thought we should have asked for more based on his deposition testimony. Counsel, counsel. But that's someone, and everyone has a right to give a number to the value of their life and enjoyment, $52 million. That's the question. That's the difference between putting a number on the value you put to your years of life, and then what the damages are. Because that value is the value. You mean to tell me he's going to live less years? What are we talking about? This is the value that the jury put on, and there is... What basis would the jury have to put value on his life like that? I mean, everybody wants to live. I mean, a poor person, a poor person, because you I'm sure that's important, but a poor person has a value in life too. So if somebody says, I put $52 million, what is it worth for my life in the time? That would be adequate too, right, for anybody, right? Well, given that Dr. Eshelman was one of the most prominent leaders in the pharmaceutical industry, there are thousands of people who... As a matter of fact, he got awards. Was he taken from any boards he was on? He was intending to step down from those boards and was not able to step down from those boards because it would have... Did he receive money for being on the boards? He certainly lost the value of those years of retirement. Did he receive money for being on the boards? I believe that there was some... Yes, I believe there was some nominal amount for being on the boards, but the pattern instructions are very clear. And the Supreme Court in the Gertz case has said that juries can award substantial sums even without proof of loss of reputation. That's the Gertz case. That's the United States Supreme Court. And so there has not been a single... The Fort Knot case was not a defamation case. And the World... I apologize. The other case that counsel mentioned, World... I'm sorry, I'm misremembering the name. That was also not a presumed damages case. There has not been a remitted of any presumed damages case. And Mr. Martinez is asking this court for the first time to remit a presumed damages case. And the cases that we cite are comparable. Steve Wynn was awarded $17 million of damages based on an oral statement by the Girls Gone Wild founder, who was someone that was not really a credible person to be making those statements. Here, Alan Auerbach did have a solid reputation in the pharmaceutical industry and made these statements in a permanent online global forum. And the pattern instructions also recognize that this needs to compensate for possible future harm, not just current harm, not just... And certainly not... It does not require actual proof of harm, but also future harm. And when industry insiders are using SEC filings to do diligence, this will never go away. And Dr. Eshelman's grandchildren, when they... They will not know... His great-grandchildren will not know him. He will be gone. All they will know is what is available about him online. And the jury heard these arguments and their award is entitled to great discretion, particularly with the standard of review that applies here without a Rule 50 motion. All right. Thank you so much. Mr. Martinez? Your Honor, just a couple of points on the... Focusing mainly on the damages. First of all, Your Honor, I think it's notable that my opposing counsel had nothing to say really about the number of people that viewed the defamation. I think what she pointed to is essentially the same numbers that we were pointing to. It's very hard, of course, to emphasize, to estimate the SEC, people who viewed it on the SEC website. But as I said earlier, there's really no reason to believe that any substantial number of people did because if they had, and if it had harmed Mr. Eshelman, we surely would have seen some evidence of harm presented. What she did bring up, which I had not remembered, was, of course, it's permanently there. It is permanently there, Your Honor. And I think by that logic, then any amount of damages would be award... Would be sort of in play whenever you have something that's a defamation that's posted on the internet. Because as we all know, it's very hard to delete something from the internet. I don't think that can be the law, especially in a case like this, where there's... Well, I don't think that that analogy is quite right, because the SEC, you know, it's a particular source that people in the industry look at. It's not just looking on the internet, period. And a particular knowledge that they would be... But I don't think there's any reason to believe that anyone is going to be searching for this through the presentation materials that came up in the context of a proxy fight that has long been over, and that they're going to be sort of searching through that and look on page slide 13 or 12 of a presentation that Puma put up many years ago. Couldn't they just put in his name and get it? I don't know the answer to that, Your Honor. I don't know if it's searchable, but I don't think we don't have any reason to believe that in the real world people are actually doing that. And certainly there's nothing in the record to that effect. I think the other thing that... Another thing that my colleague pointed to was a testimony from an individual aided capital, Mr. Gross. But if you look at that testimony, that's at JA page 772, he's very clear that he didn't believe what he saw. And so obviously that couldn't have caused harm to Mr. Eshelman. Opposing counsel talked about the self-serving statements about lost retirement. But as Judge Gregory pointed out, it's certainly the case that Mr. Eshelman was... Almost certainly the case. And I would be very surprised if opposing counsel would actually dispute that he received significant payments for his service on private sector boards, seven boards, a number of which were private sector boards, in addition to all the other evidence we have of his reputation sort of remaining. I think it's also notable that... But sir, he testified that that was the... And we have to take his testimony as credible because you didn't have contrary testimony to what he said about this. And he said he wanted to retire. And he didn't want to do this. And I don't have wealth like that, but I can certainly understand that. He had plenty of money to live on. He wanted to go cruise. Your Honor, I think fair enough. He did say that. I think if you want to look at the record transcript and see what way to give it, I think that's fine. I don't think it can get you anywhere close to the damages award that it was asserted here. Certainly, Mr. Eshelman knew of this purported desire to retire at the time that four times before trial, he was estimating his harm at only $7.5 million. And so there's really nothing new information he would have had after that that would have justified an award of this size. Finally, on the damages, I was sort of surprised my opposing counsel thinks that the best comparable award is the Steve Wynn Award. I mean, that was a case in which Mr. Wynn received a very similar figure, $17 million. But where the defamation at issue was about threatening murder and it was put on Good Morning America, which is a television program that has 4.1 million viewers. I mean, if that's the best case they have, then I think it's absolutely clear that this damages award is too big and has to be remitted. One quick statement with respect to the facts, Judge Gregory, Chief Judge Gregory, you were asking about this. I don't think it's the case. I don't think it's fair to say that, as my opposing counsel said, that Mr. Eshelman was simply saying he was sort of captain of the ship and the buckstop was with him. I would encourage you very strongly to look at that congressional testimony, especially at pages 1597 to 98. Ms. Locke says that PPD was the hero here. They reported the fraud. What actually happened was that there was a PPD employee who was a whistleblower, who was the one who really was the mover here. The congressional testimony shows that PPD called her, its lawyers called her multiple times, basically telling her she wasn't allowed to report this to the FDA. And this is all about whether this is defamatory per se? That's right. And just to contextualize that argument. Your Honor, with respect, I think we've preserved the idea of whether it was defamatory per se. We haven't made a truth argument in this court, but I do think that the actual facts inform the way that you should construe the statement. And I think that in this case, we had a good argument to make, given what was said in the congressional testimony, the fact that Mr. Eshelman's senior executive, this is at page 1597 of the JA, the senior executive told congressional staff that Eshelman knew about the fraud and didn't report it. And then Eshelman himself accepted responsibility on page 1598. Now you may disagree with us and the jury disagreed with us about the truth or falsity of the statements. Fair enough. But when we're talking about what the statements intended to convey, I think that those facts illustrate that what we were intending to convey was not that he personally committed fraud, but that he was essentially, he failed to report the fraud that he knew about or should have known about as head of PPD. Unless the court has any other questions, I appreciate the chance to argue the case. And we do ask the court to reverse or to remit the damages to a reasonable number. Thank you, Mr. Martinez. And thank you, Ms. Locke for your arguments. We would love to come down and greet you as we normally do in the Fourth Circuit, but we can't. But nonetheless, we very much appreciate your arguments and your being here today. If we did come down, I would tell you each that these were two great briefs, really. Yes. Thank you, your honor. Thank you, your honor. Yeah, just like Judge Moss gave you the whisper in your ear comments you would have gotten. So, yeah. I can never stop myself. You said a lot. No, Kelly. Well done. Good lord. Good briefs. Thank you so much. Be safe and stay well. With that, I'll ask the clerk to, I guess, adjourn the court for the next appropriate hour. The honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Roger L. Gregory, Diana Gribbon Motz, Stephanie D. Thacker